**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Pedro E. OZUNA, Defendant–Appellant.**

No. 96–2258.

United States Court of Appeals,
Sixth Circuit.

Submitted Dec. 11, 1998.

Decided March 25, 1999.

Ross G. Parker (briefed), Office of U.S. Attorney, Detroit, MI, for Plaintiff–Appellee.

Pedro E. Ozuna (briefed), Ft. Dix, NJ, pro se.

Before: SUHRHEINRICH and CLAY, Circuit Judges; CARR, District Judge.*

CARR, District Judge.

Defendant–Appellant, Pedro E. Ozuna, was charged in a five-count indictment with exportation of cocaine (21 U.S.C. § 953), importation of cocaine (21 U.S.C. § 952), possession with the intent to distribute cocaine (21 U.S.C. § 841(a)(1)); failure to report exportation of monetary instruments (31 U.S.C. § 5316), and failure to report importation of monetary instruments (*Id.*). He was convicted at trial of all counts, and received concurrent sentences of sixty-three months on counts 1–3 and sixty months on counts 4 and 5 and a supervised release term of four years.

This rather unusual group of charges resulted from defendant's trip on March 29, 1996, from Port Huron, Michigan, to Sarnia, Ontario, Canada, during which defendant exported the cocaine and currency, and his almost immediate return to Port Huron, after being denied entry into Canada, when he imported the cocaine and currency back into the United States.

On arriving in Canada, defendant told Canadian customs officials that he was a United States citizen en route from Chicago to New York. After being sent to the Canadian Customs Office for secondary inspection, defendant displayed a Florida driver's license bearing the name Radamy Sanchez. Because the Canadian officials could not ascertain defendant's citizenship, they refused to

---

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

permit him to enter Canada. He was sent back to the United States.

On arriving back in the United States, defendant was referred to the secondary inspection area where Immigration Inspector Joseph Polatowitz was working. He presented the same driver's license to Inspector Polatowitz that he had given to the Canadian inspector. On being asked by the Inspector to state his citizenship, defendant, speaking English, told him that he was a United States citizen, born in Puerto Rico and living in Florida since he was four years old. In response to a question about his destination, defendant stated that he was traveling to visit his family in New York.

At this point, Inspector Polatowitz, seeking to confirm defendant's identification, asked to inspect his wallet. Though he found business cards, otherwise "[t]here really wasn't any pertinent identification, as far as ID other than just general things that you put in a wallet." (JA 122). There were, however, two items containing the defendant's true name: one a business card for a body shop and the other a document in Spanish that looked like a religious form. In addition, the wallet contained $760.

Asking defendant again about his itinerary, Inspector Polatowitz was told that he was en route from Florida to New York. The Inspector asked why he was coming from Canada, but did not get a direct response.

Inspector Polatowitz, joined by another Immigration Inspector, decided to search defendant's car. During that initial search the Inspectors observed a small tool set with a screwdriver, a flashlight, and clothing. Many of the items appeared new, and some still had price tags on them. Photographs, apparently recently processed, were also in the car; they depicted scenes such as those that a traveler might have taken. The trunk was empty, except for a partially used container of windshield wiper fluid. While conducting the search, Inspector Polatowitz noticed defendant had gone to a pay phone and was making a call.

When defendant returned to the secondary inspection area, Inspector Polatowitz, still trying to verify defendant's identity, patted the defendant down. During that search, he found the rejection slip from the Canadian authorities and defendant's car rental agreement. That document showed that defendant's car was leased in Texas. The rental agreement papers contained two names—Ramady Sanchez (the name on the Florida driver's license originally displayed by defendant) and Ramon Ramierez. Still uncertain of defendant's identification, Inspector Polatowitz asked more questions about the defendant's name and citizenship.

In the meantime, another inspector, Inspector Hiscock, had found a rolled up dollar bill from the Dominican Republic in defendant's wallet. He asked defendant whether he lived in that country, and defendant stated that that was where he was from. He was also asked about the names on the rental agreement, but he gave no response.

Customs Inspector Scott Masteller, who was fluent in Spanish, was asked to participate because defendant had raised a "language barrier," and, as well, due to discrepancies in some of defendant's answers in English. In response to questions about his place of birth, citizenship, and where he was coming from, defendant told Inspector Masteller that he was a United States citizen living in New York, and that he had come from Canada. He also told the Inspector that his name was Ramady Sanchez.

Later during the conversation, defendant, who had told Inspector Masteller that he was born in the United States, acknowledged that he had been born in the Dominican Republic. During the course of his conversation with Inspector Masteller, defendant gave other inconsistent answers about his occupation, itinerary, and the length of time he had been away from New York.

Inspector Masteller handed defendant a Customs declaration form. Defendant stated he only had the $760 in his wallet. On being asked about his driver's license, defendant stated that he had purchased it for $100. The inspector then asked him about one of the photographs, which showed defendant with a Nissan Sentra with Texas license plates. The Sentra, the Inspector testified, was often used by drug couriers because

false compartments could easily be installed in that make of automobile.

Having been given a New York telephone number, Inspector Masteller, still trying to learn defendant's name and citizenship, placed a call and spoke with a person identifying herself as defendant's stepdaughter. She told him that defendant was currently unemployed and had worked as a cab driver, mechanic, and paint and body man. She also stated that defendant was a resident alien and had been born in the Dominican Republic. She provided information from defendant's passport about his, name, residence and citizenship.

After Inspector Masteller's conversation with defendant's stepdaughter, Inspector Polatowitz asked him for his true identity, and defendant gave his actual name. He also stated that he lived in Florida and was traveling to visit his family in New York. Through a check of Immigration Service records, Inspector Polatowitz learned defendant's resident alien number and that he had been processed through the Immigration Service and was a citizen of the Dominican Republic. Nonetheless, Inspector Masteller testified on redirect examination, the officers still had no proof that defendant was Pedro Ozuna.

The Inspectors conducted a further, and more intensive search of the vehicle. Currency in the amount of $9500 was found concealed in the car's windshield wiper fluid container. Though a drug detection dog had failed to "alert" on the vehicle, Inspector Polatowitz continued searching. He found a container concealed underneath the driver's side front fender. In the container were two brick sized objects, the contents of which tested positive for drugs (later determined to be cocaine). During the course of discovering the hidden money and drugs, the Inspectors noticed that the car's windshield wiper fluid container had been cut open and re-glued and various screws either had been removed recently or were replacements.

On appeal, defendant raises two issues: 1) his conviction was not supported by sufficient evidence, and 2) he should have been, but

was not, advised of his rights to silence and counsel before being interrogated by Inspector Polatowitz and Inspector Masteller.

■ Defendant claims that there was insufficient proof that he knew about the money and drugs concealed in his rental vehicle. We disagree, and find ample evidence from which the jury could conclude beyond a reasonable doubt that the defendant knew that those items were hidden in the car: the inconsistency of his statements to the Canadian Immigration officers and Inspectors Polatowitz and Masteller; the partially full container of windshield wiper fluid (purchased, one could reasonably infer, after the car's original fluid had been drained during concealment of the $9,500); his possession of a screwdriver set, which could have been used to conceal the money and drugs, or to remove them; and his rental of the vehicle using a false name and driver's license. The defendant's conviction on each of the five counts was supported by sufficient evidence. Whether any one of these circumstances, standing alone, would suffice to convict is immaterial: when added together in this case they show beyond a reasonable doubt that the defendant knew about the hidden contraband.

■ Defendant's challenge to testimony about his statements to Inspectors Polatowitz and Masteller is asserted for the first time on appeal. His failure to have raised this issue in the District Court limits our review to a determination of whether the admission of this testimony constituted plain error. *See United States v. Critton*, 43 F.3d 1089, 1093–94 (6th Cir.1995) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)); *United States v. Cox*, 957 F.2d 264, 267 (6th Cir.1992).

■ The duty to give the *Miranda* warning attaches when a person is subjected to "custodial interrogation." *Miranda v. State of Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965). Because defendant fails to show that he was in custody, we need not reach the issue of whether he was subject to interrogation.[1]

1. We note, however, that not all questioning of

in-custody suspects constitutes interrogation trig-

Determination of whether an individual is in custody for purposes of applying the *Miranda* doctrine considers "how a reasonable man in the [individual's] position would have understood the situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984). Because this is an objective inquiry, the subjective beliefs of the interrogating officers or the person being interrogated are irrelevant. *See Stansbury v. California*, 511 U.S. 318, 322–23, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). Even when probable cause exists to arrest a suspect, *Miranda* rights do not necessarily attach. *Berkemer*, 468 U.S. at 435, 104 S.Ct. 3138.[2] The ultimate inquiry is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (quotation marks and citations omitted).[3]

Other courts have held consistently that the *Miranda* warnings need not precede initial routine questioning by Immigration or Customs officials because such questioning is not "custodial interrogation." *See United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir.1992); *United States v. Harrell*, 894 F.2d 120, 124 (5th Cir.1990). As stated by the Fifth Circuit, sitting en banc in *United States v. Bengivenga*, 845 F.2d 593, 598–99 (5th Cir.1988) (en banc), "routine citizenship checks ... do not impose a degree of restraint associated with arrest because the detention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint." Every day thousands of travelers enter this country and "each is detained until a search has been made or his answers to questions have convinced the customs agent that no search is necessary. To say that by reason of such 'detention' each is in custody, or that an investigation has focused upon him would distort the *Miranda* rule beyond recognition." *Chavez–Martinez v. United States*, 407 F.2d 535, 537 (9th Cir.1969).

Customs and immigration inspections, like the traffic stops in *Berkemer*, are usually brief. Brevity is not, however, a precondition to the lawfulness of questioning at a border to determine identity and citizenship. There is no fixed limit to the length of the questioning, and its duration is simply one factor to consider in assessing the lawfulness of the officers' activities. *See Harrell*, 894 F.2d at 124. A defendant must do more than simply show that the questioning has somehow deviated from the questioning of the average Customs interrogee. *See Ventura*, 85 F.3d at 710; *see also United States v.*

gering *Miranda* protections. In the context of routine booking following an arrest, this Court has held that "routine biographical questions are not ordinarily considered interrogation." *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993); *see also United States v. Ventura*, 85 F.3d 708, 712 n. 5 (1st Cir.1996) (routine biographical questions during booking do not trigger *Miranda*); *Cervantes v. Walker*, 589 F.2d 424, 428 n. 5 (9th Cir.1978) (same).

Questions to someone coming into this country about his identity and national origin are equally "biographical," and every bit as important to the officer's performance of his duties as are the questions normally asked following a suspect's arrest when he is booked into custody. In neither circumstance is interrogation occurring, and it did not occur in this case. Like the court in *Cervantes*, however, we express no opinion whether this *Miranda* exception applies in the Customs setting. *Cervantes*, 589 F.2d at 428 n. 5.

**2.** *See United States v. Bengivenga*, 845 F.2d 593, 597 n. 15 (5th Cir.1988) (noting that when sus-

pects make statements to undercover agents, *Miranda* protections do not attach even though the agent has probable cause and the investigation has focused on the suspect).

**3.** This test has also been phrased as "whether a reasonable person in the suspect's position would have felt 'free to leave.'" *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.1998). While this test is useful in many circumstances, it can lead to erroneous results if applied without attention to surrounding circumstances. There are many instance where a suspect will not feel "free to leave" and nonetheless not be in custody for purposes of *Miranda*. For example, "individuals subject to routine traffic stops or customs inspections, circumstances which are not custodial, are rarely free to leave while being questioned by an officer." *Ventura*, 85 F.3d at 712. Likewise, prisoners are not free to leave their prisons, but *Miranda* warnings need not precede questioning until there has been "a restriction of [the prisoner's] freedom over and above that of his normal prisoner setting." *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir.1978).

*Pratt,* 645 F.2d 89, 90–91 (1st Cir.1981) (holding that secondary inspection does not *per se* constitute custodial interrogation).

 When considering whether defendant was in custody, we must consider all relevant circumstances. *See Thompson v. Keohane,* 516 U.S. 99, 113 & n. 11, 116 S.Ct. at 465 & n. 11, 133 L.Ed.2d 383. All persons attempting to enter the United States must anticipate detention while answering a few basic questions and this "cuts against the potentially coercive aspect of the Customs inquiry." *Ventura,* 85 F.3d at 711. Here, though the questioning lasted over an hour, there is no indication that defendant was asked anything other than routine questions. (JA 197–200). The questions being asked of defendant, like the phone call to his stepdaughter, were directed toward learning and confirming his identity and citizenship. The same few questions were repeated a number of times in both English and Spanish. The length of the interview resulted from defendant's own acts, namely, giving incomplete and inconsistent answers which necessitated repetition of the questions.[4] Even a routine traffic stop will last more than a few minutes if the driver fails to present a valid driver's license or vehicle registration.

Under this standard, a person entering this country is likely to anticipate only a brief series of simple questions, and understands his obligation to answer those questions before being permitted to travel further. Where, however, a person seeking to enter is doing so without using his actual name and valid documentary verification of his identity, any expectation that his detention at the border would be brief would be unreasonable. A reasonable person with language difficulties would naturally anticipate a longer wait at the border. Applying that rule to the facts of this case, we find no error in admitting defendant's responses to the questioning by Inspectors Polatowitz and Masteller.

We conclude, accordingly, that a reasonable person in defendant's situation would have understood that he might be subjected to considerable questioning by officers responsible for determining the identity and citizenship of those who seek to come into the United States. The questioning in this case, though perhaps longer than usual, always remained limited in scope. The restraints on defendant's movement were no more significant than those experienced by anyone waiting at an inspection station; there was nothing exceptional about those restraints. Ordinarily, these restraints are negligible because of their brief duration. Here, their duration was more substantial, but that was, as discussed above, a result of defendant's own inability to provide satisfactory answers to a few simple, but essential questions. Consequently, defendant was not "in custody" for *Miranda* purposes.

Sufficient proof sustains defendant's conviction. His statements were properly admitted. His conviction is, accordingly, **AFFIRMED.**

---

4. Though at some point the officers may have become suspicious that the defendant was a drug courier, in view of his inconsistent responses to their questions, those suspicions did not rise to the level of probable cause until the after the officers were done questioning the defendant. Our review of the record persuades us that the time taken in the effort to find out who the defendant was and where he was from was reasonable.