*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0023P (6th Cir.)
File Name: 03a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

JEFFREY GLENN GALLOWAY,
    *Defendant-Appellant.*

No. 01-5299

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 00-00003—Joseph M. Hood, District Judge.

Submitted: October 16, 2002

Decided and Filed: January 17, 2003

Before: BOGGS, SUHRHEINRICH, and CLAY, Circuit
Judges.

———————————

**COUNSEL**

**ON BRIEF:** Roy G. Romo, Houston, Texas, for Appellant.
Charles P. Wisdom, Jr., ASSISTANT UNITED STATES
ATTORNEY, Lexington, Kentucky, David L. Bunning,
ASSISTANT UNITED STATES ATTORNEY, Covington,
Kentucky, for Appellee.

1

SUHRHEINRICH, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 15-27), delivered a separate dissenting opinion.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge. Defendant-Appellant Jeffrey Glenn Galloway appeals from the judgment entered on February 27, 2001, in the United States District Court for the Eastern District of Kentucky, of conviction by jury and sentence imposed on three counts arising out of his importation and possession of ecstacy in violation of 21 U.S.C. §§ 841 and 846, and 21 U.S.C. § 952.[1]

Galloway raises three issues on appeal. First, he claims the district court erred when it admitted into evidence statements made by Galloway to a United States Customs Inspector, in violation of Galloway's Fifth and Sixth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Second, Galloway claims he is entitled to a new trial because the prosecutor made improper remarks during final argument. Third, Galloway claims his counsel was ineffective because his counsel elicited testimony from Galloway's co-conspirator which tended to inculpate Galloway, since it showed that he generally promotes drug use.[2]

We deny Galloway's claim and affirm on all issues. First and foremost, we hold that *Miranda* is inapplicable because a secondary customs inspection is a routine, non-custodial

_____

[1] Ecstacy is the most common street name for the chemical composition 3-4 methylenedioxyamphetamine ("MDMA").

[2] Galloway alternatively claims that his counsel was ineffective if he failed to preserve Galloway's *Miranda* claim for appellate review. We find this claim moot in light of our analysis of Galloway's *Miranda* claim on the merits.

remarks may have had." *Id*. at 36. Since the putative "admonition" in Galloway's trial never identified what the court found objectionable, it could not possibly have been "well designed to cure [the] prejudicial impact" of the prosecutor's remarks. *Id*.

Finally, recall again the language in *Francis*, which requires that the court "admonish the *jury*." 170 F.3d at 550 (emphasis added). The court's rebuke was obviously aimed at the prosecutor, not the jury. The court ordered the prosecutor, not the jury, to "move on." The jury undoubtedly heard the court sustain the defense objection, but no one can plausibly claim that the court directed its remark to jurors, which is what *Francis* requires. *See id.*

I would reverse the conviction. Since there was no admonishment following the defense objection, and the government did not present an overwhelming case, I respectfully dissent. *See id.*

provides no guidance whatsoever.[3] *Cf. Lakes v. Ford*, 779 F.2d 1578, 1580-81 (11th Cir. 1986) (finding curative instruction inadequate when it only contradicted a mandatory presumption, rather than explaining its importance and applicability).

What the majority terms an admonishment was not only unacceptably terse, it was hopelessly ambiguous. The prosecutor's objectionable statement was one sentence long (fifty-four words) and occurred in the midst of a lengthy closing argument. Without greater specificity from the court, the jury may not have understood precisely what warranted the objection. Even assuming the jury knew that the court's statement, "Sustained. No evidence. Move on," meant that they should ignore something the prosecutor said, the jury would not know *what* to ignore. In *Singer v. United States*, 380 U.S. 24 (1965), the Supreme Court found the trial court's limiting instruction sufficient because the "court's admonitions to the jury seem to have been well designed to cure whatever prejudicial impact some of the prosecutor's

---

[3]The majority claims that this Court's opinion in *United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991), "indicat[es] that the timing of an admonition is more important than the firmness." *Solivan* does explain that "[b]oth the timing and the firmness of the trial court's admonition are relevant in evaluating whether an admonition has been sufficient to mitigate prejudicial error." *Id. Solivan*, however, never suggests (as the majority does) that timing is *always* more important than firmness, or that timing and firmness are the only relevant considerations. *See id.*

In fact, the "firmness" of an admonishment is difficult to evaluate on appeal because the forcefulness of oral language depends heavily on volume, tone, cadence, facial expression, and so forth. Timing is "relevant," as *Solivan* says, *see id.*, but not dispositive. In fact, timing matters greatly, but no admonishment, no matter how rapidly delivered, suffices if the instruction lacks the content necessary to appropriately guide the jury's deliberation.

The majority also cites *Solivan* for the notion that a curative instruction is only adequate if it is swift and proportional to the potential harm. *See id.* As the majority rightly concedes, the prosecutor's statement was clearly improper and prejudicial, which makes it hard to accept that a five-word snippet devoid of content was proportional to the potential harm.

detention. Second, the prosecutor's statements, although improper, do not warrant a new trial in the face of the other overwhelming evidence. Finally, ineffective assistance of counsel claims are generally not heard on direct appeal, and the record here is insufficient to permit us to hear the claim.

## I.   Facts

On January 19, 2000, a narcotics canine alerted on a bag at the Greater Cincinnati- Northern Kentucky International Airport in Covington, belonging to Galloway's co-defendant, Kristie Kirsch, who had arrived with Galloway on a flight from Brussels, Belgium. Once Kirsch identified the bag, customs inspectors removed both her and Galloway.

Customs inspector Jeffrey Vaughn took Defendants to a secondary inspection area, pursuant to the U.S. Customs Service's authority to search travelers under 19 U.S.C. § 1582.[3] Vaughn began his inspection by informing Defendants that a canine had alerted on Kirsch's bag. At this time, Vaughn neither placed Defendants under arrest, nor read them their *Miranda* rights.

Vaughn began his questioning by asking Kirsch why she thought the canine had hit on her bag. She responded that it was because of "those cafes," indicating "dope smoking cafes," more commonly referred to as hash bars. As he searched Defendants' bags, Vaughn turned his questioning to Galloway, and asked him a series of questions, each revolving around the places he had been in Europe. Specifically, Vaughn was trying to ascertain whether Galloway and Kirsch had been to Amsterdam, the Netherlands. In response to these questions, Galloway made several statements denying he had been to Amsterdam.

---

[3]Section 1582 provides: "[A]ll persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under [Treasury] regulations." 19 U.S.C. § 1582.

After concluding his questioning of Galloway, Vaughn asked Kirsch for her coat, which he testified felt rather heavy when he picked it up. He removed the lining and found a number of pills, later identified to be the drug ecstasy. Vaughn ceased his questioning and placed Defendants under arrest for importation and possession of an illegal substance.

On May 8, 2000, Galloway filed a motion to suppress the statements he had made to Vaughn at secondary inspection, because they were obtained without proper *Miranda* warnings. Basically, the statements amounted to Galloway denying he had ever been to the Netherlands, even when faced with evidence to the contrary found in his bag, such as Dutch money, merchandise bearing an Amsterdam logo, and train tickets from Brussels to Amsterdam.

The district court denied the motion on September 28, 2000, finding that *Miranda* warnings were not required. The judge reasoned that the secondary inspection was a routine customs inquiry, and as such, not entitled to *Miranda* protections under *United States v. Ozuna*, 170 F.3d 654 (6th Cir. 1999).

Galloway proceeded to jury trial, where Galloway's false denial of traveling to Amsterdam was introduced as evidence of his guilt. Kirsch testified against him in exchange for concessions from the Government.[4] Specifically, Kirsch testified that Galloway had hired her as a mule to carry the ecstacy from Amsterdam.[5] Galloway's response was that

---

[4]Kirsch was allowed to plead guilty to fewer of the charges and received a reduced sentence.

[5]Kirsch testified that she met Galloway while she was working as a waitress at a topless bar called Treasures, in Houston. She further testified that after she lost her job, Galloway was aware that she needed money and approached her about serving as a mule. She agreed and Galloway paid for all her expenses, including paying for her passport, and buying her airfare, her hotel, and the coat in which she was carrying the ecstacy. Moreover, she countered Galloway's assertion that she was his girlfriend by insisting she was a lesbian.

drugs travels with the individual carrying the drugs.

Defense Counsel:     I would like to object.

Court:          Sustained. No evidence. Move on.

(J.A. at 225.) The court had an obligation to properly "admonish the jury." *Francis*, 170 F.3d at 550. The court said only, "Sustained. No evidence. Move on." (*Id.*) Limiting instructions and sustained objections are different. The court's remark does not appear to be an admonishment or limiting instruction at all.

Returning to the dictionary once more, an admonition is "any authoritative oral communication or statement by way of advice or caution by the court to the jury respecting their duty or conduct as jurors, the admissibility or nonadmissibility of evidence, or the purpose for which any evidence admitted may be considered by them." BLACK'S LAW DICTIONARY 49 (6th ed. 1990); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 28 (1993) (defining "to admonish" as "to indicate duties, obligations, or requisite action to (a person)"). Thus, an "admonition" must have content. It needs to explain to the jury how to handle the improper statement in a manner consistent with the law. In a slightly different context, the Supreme Court explained:

Obviously, a limiting instruction can be used to give content to a statutory factor that "is itself too vague to provide any guidance to the sentencer" only if the limiting instruction's own "definitions are constitutionally sufficient," that is, only if the limiting instruction itself "provide[s] *some* guidance to the sentencer."

*Shell v. Mississippi*, 498 U.S. 1, 3 (1990) (quoting *Walton v. Arizona,* 497 U.S. 639, 654 (1990) (emphasis in original). This makes extremely clear that a limiting instruction must provide guidance, yet the trial court's laconic response

*e.g., United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991).

Juries have great confidence in what prosecutors say. Since juries have confidence in the trustworthiness of prosecutors, *see Berger II*, 295 U.S. at 88, "improper [prosecutorial] suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id*; *see also Bess*, 593 F.2d at 755 (6th Cir. 1979) ("An Assistant United States Attorney purports to represent the People of the United States, and thus carries a special aura of legitimacy about him."). Relying on his own experience, the prosecutor explained that mules do, in fact, sometimes travel with their bosses. If the jury believed him—which is not an unreasonable assumption—then it cannot safely be said that the comment "did not contribute" to Galloway's conviction. *Solivan*, 937 F.2d at 1157. Whether looking at the dictionary definition of "overwhelming," the case law, or background legal principles, the case against Galloway is sufficient to support a conviction, but not *overwhelming*.

The majority could concede this point, however, yet still justify the decision to affirm because the *Francis* test only requires reversal (even without overwhelming evidence) if the court failed to cure the impropriety by failing to admonish the jury." 170 F.3d at 550. The majority argues that the trial court "satisfie[d] the curative instruction requirement." The following is the entire relevant exchange, including the court's response after the defense objected to the improper prosecutorial comment:

> Prosecutor:    I have tried several cases myself where we see the mule term, and we have a defendant who claims he or she is a mule, and I have had several cases where, kind of like the bodyguard scenario, where the individual who is responsible for the

Kirsch was his girlfriend and that he had no knowledge of the drugs she was carrying. The jury convicted Galloway on all three counts and he was sentenced to ninety-seven months.

Galloway filed a timely notice of appeal on February 27, 2001, the same day the judgment was imposed, and this matter is properly before this Court.

## II.   Galloway's *Miranda* Rights

We review a district court's ruling on a motion to suppress through a mixed standard of review. Findings of fact supporting the court's decision are reversed only if they are clearly erroneous. The court's final determination as to the reasonableness of the search is a question of law reviewed de novo. *United States v. Harris*, 255 F.3d 288, 291 (6th Cir.), *cert. denied*, — U.S. —, 122 S. Ct. 378 (2001); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 371 (6th Cir. 1998). When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government. *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993).

Galloway claims that any statements made by him to Vaughn should be suppressed because they were obtained in violation of *Miranda*. *Miranda* warnings are necessary only if the defendant is subjected to a "custodial interrogation." *Miranda*, 384 U.S. at 477. Accordingly, Galloway argues that he was "in custody" when Vaughn was performing the secondary inspection.

Whether a person is in custody for *Miranda* purposes is determined by neither the perception of the defendant nor of the police. It is determined by the objective perception of a reasonable man in the defendant's shoes. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The standard is perhaps best stated another way: "The test must be not what the defendant himself, as a possessor of drugs at the time of his detention, thought, but what a reasonable man, *innocent of any crime*, would have thought had he been in the defendant's shoes." *United States v. McKeathan*, 247 F.

Supp. 324, 328 (Dist. D.C. 1965) (emphasis added); *see also Coates v. United States*, 413 F.2d 371, 373 (D.C. Cir. 1969); *United States v. Coleman*, 450 F. Supp. 433, 439 (E.D. Mich. 1981). We believe the standard is more accurately stated this way because a reasonable guilty person will always perceive his situation as coercive.

First, it is necessary to explain the customs procedures to which Galloway was subject. According to the U.S. Customs Service, every passenger who arrives in the United States on an international flight, whether he is a United States citizen, alien, or foreign national, is subject to cursory screening (primary inspection). The passenger is usually asked questions regarding his trip, including the countries he has visited, any merchandise he has brought back, and the value of such merchandise. His answers are checked against his customs declaration form, and usually he is sent on his way. However, a portion of travelers are held over for secondary inspection. An inspector will recommend a traveler for secondary inspection for several reasons — for instance, if the traveler is suspected of carrying narcotics. Moreover, a secondary inspection may be ordered if the inspector suspects a traveler owes customs duties, or has undeclared, commercial, or prohibited merchandise. Furthermore, the U.S. Customs Service has developed a program called Compliance Examination (COMPEX), in which it randomly selects additional travelers for secondary inspection based on no suspicion whatsoever. During secondary inspection, the passenger is asked more detailed questions about his trip and may have his bag and body searched. The procedure lasts a few minutes and if nothing is found, the traveler is free to go. *See* U. S. CUSTOMS SERVICE, WHY U.S. CUSTOMS CONDUCTS EXAMINATIONS, *a t* http://www.customs.ustreas.gov/travel/examinations.htm [hereinafter *Customs Website*].

Under 19 U.S.C. § 1582, the U.S. Customs Service has the authority to subject every international traveler to a secondary inspection, but it does not do so because resources are limited. *See Customs Website*. As opposed to jailhouse interrogations

mule because he traveled with her. Put rhetorically, why would Galloway pay a mule to import drugs from Europe and risk arrest upon reentry, and then accompany the mule, thereby exposing himself to the very risk he paid to avoid? In his closing argument, the prosecutor answered the question himself:

> I have tried several cases myself where we see the mule term, and we have a defendant who claims he or she is a mule, and I have had several cases where, kind of like the bodyguard scenario, where the individual who is responsible for the drugs travels with the individual carrying the drugs.

(J.A. at 225.) The government introduced no evidence establishing the propensity of mules to travel with their bosses. Instead, the prosecutor used his personal experience to annihilate the crux of the defense. Without the prosecutor's testimony, a reasonable jury could have accepted Galloway's theory.

Second, due process concerns influence how we define "overwhelming." As the Supreme Court explained in a habeas context, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). To make our test consistent with *Darden*, the government's case can only be "overwhelming" (and thus precluding retrial) when the defendant's due process rights were not disturbed despite the improper statement. Thus, "[t]he question is whether there is a reasonable possibility that the [inadmissible] evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 87 (1963). Applying this logic, this Court has reversed convictions when we were unable to "conclude that there is no reasonable possibility that the [improper prosecutorial] comments did not contribute to defendant's conviction." *See,*

Armstrong's excuses for the large cash deposits were not credible, e.g., that drug dealers paid her for letting them use her driveway to sell drugs

Blue Cross systematically and electronically included vouchers (describing the subscriber and the provider) with its checks, which contradicts Toney's testimony that no vouchers were attached to any of her checks

Toney admitted never having completed any paperwork for the alleged reimbursement and never having provided Armstrong with any details regarding the nature of the care she provided, e.g., the daily hours spent caring for her father or the travel distances to the hospital.

*Id.* at 411-12.  We found this case "overwhelming," and thus a new trial unwarranted.  *Id.* at 412.  *Toney* is an "overwhelming" case, *Carroll* is not, and the case against Galloway is weaker than the case against Carroll, or at least equally thin.  The case law suggests, therefore, that the case against Galloway is not "overwhelming."

Two other arguments deserve mention.  First, logically, "overwhelming" must mean something more than certainty "beyond a reasonable doubt."  Otherwise, the first portion of the test, whether "proof of the defendant's guilt is not overwhelming," *Francis*, 170 F.3d at 550, would be superfluous.  One can conceive of a spectrum of sustainable guilty verdicts running from evidence proving guilt "beyond a reasonable doubt" on one end, to "overwhelming" evidence of guilt on the other.  Appellate courts do not disturb a guilty verdict if any "rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  To keep "overwhelming" evidence analytically distinct from evidence of guilt "beyond a reasonable doubt" (at the other end of the spectrum), it makes sense that an "overwhelming" case is one in which no reasonable jury could acquit.

This is certainly not true in Galloway's case.  Galloway argued that Kirsch could not possibly have worked as his

and other situations we have held custodial, there is no probable cause required for the Customs Service to detain a traveler for a secondary inspection. *See* 19 U.S.C. § 1582; *cf. Miranda*, 384 U.S. 436 (involving defendants already placed under arrest).  Its power to search is vested in the voluntariness of the traveler's attempt to re-enter the country. *United States v. Ramsey*, 431 U.S. 606, 619 (1977); *see also United States v. Scheer*, 600 F.2d 5, 6 (2d Cir. 1979). "[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country." *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996).

We have held that *routine* customs inspections are non-custodial and do not require the reading of *Miranda* rights.  In *United States v. Ozuna*, 170 F.3d. 654 (6th Cir. 1999), at a routine Canadian border stop, inspectors asked the defendant questions in an attempt to determine his identity.  Ozuna lied and presented a false identity.  A search of the defendant ultimately produced some drugs, and the statements Ozuna had made were introduced against him.  We held the statements admissible because a primary customs inspection is not custodial since all travelers are subject to the same treatment and the reasonable man views it as a cursory requirement of re-entering the country.  *Id.* at 659.

The district court found that *Ozuna* controls here.  However, Galloway argues that *Ozuna* applies only to *primary* customs inspections, and does not speak to more particularized *secondary* inspections like the one to which Galloway was subjected.  Galloway argues that the accusatorial and focused nature of a secondary inspection goes well beyond what the reasonable traveler would consider routine or non-custodial.  However, the fact that an interrogation is not random, but focused on a particular defendant, does not automatically render it custodial.  *See Mathiason v. Oregon*, 429 U.S. 492, 494 (1977) (per curiam) (stating "[n]or is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect"); *Beckwith v. United States*, 425 U.S. 341,

346-47 (1976) (stating it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning"). The totality of the circumstances must be examined to determine whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

We find no distinction between primary and secondary inspections anywhere in the customs statutes or their regulations. This distinction is merely a functional aspect of the particular nomenclature used by the U.S. Customs Service. As evidenced by the Customs Service's own business practices, the secondary inspection is no less a matter of course and no less routine than the primary inspection. Accordingly, we see no reason not to extend the rule in *Ozuna* to apply to all customary border stops, primary or secondary.

Regardless, Galloway argues that secondary inspection, as it is applied, is coercive because the traveler is not free to leave. However, although we had once stated the *Miranda* standard as being whether a defendant feels he is free to go, *see United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998), *Ozuna* demonstrates that this standard is not correct. There, we held that primary inspections are not custodial, although the traveler is not free to go. *Ozuna*, 170 F.3d at 659.

Even if a secondary inspection in general is not custodial, Galloway claims that his particular detention was, because the circumstances surrounding his inspection made it akin to an arrest. However, the questions Vaughn asked Galloway were indicative of a routine customs inquiry, no different than those that would have been asked at primary inspection. Vaughn asked, in order:

(1) To which countries did you travel?
(2) Did you go to Germany, Amsterdam, or Holland?

At trial, Armstrong testified on Toney's behalf. *Id*. at 407. Armstrong admitted her own culpability but denied any knowledge of Toney's involvement. *Id*. Prosecutors attacked Armstrong's credibility by questioning her about inconsistent oral statements she allegedly made to the FBI at the time of her arrest. *Id*. Specifically, Armstrong was asked whether she had previously told the government that Toney participated in the fraud. *Id*. Armstrong denied making such statements and the government never presented any evidence otherwise. *Id*. Nevertheless, in its closing argument, the government made three references to Armstrong's alleged prior statements. *Id*. at 410. The *Toney* opinion summarizes the evidence actually presented against the defendant:

> 31 of the 48 fraudulent Blue Cross checks were mailed to Toney and were payable to her
>
> 4 other checks payable to Baker were also mailed to Toney's home, with Armstrong ultimately receiving and cashing them
>
> Toney endorsed and cashed 27 of the 31 checks
>
> Toney cashed the checks at either the Viceroy Market, where she incurred a fee, or at various branches of Michigan National Bank, rather than depositing them in her own checking account
>
> The 27 checks Toney cashed totaled $77,257.76, and the four she failed to negotiate totaled $37,493.00, the combination being a very large sum of money for undocumented care she provided her father over an eight month period of time (to say nothing of the improbability that her father's insurance would even cover such care)
>
> Petty and Reardon knew the scheme was fraudulent and split the proceeds with Armstrong During the time frame of the scheme, a number of large cash deposits were made into Armstrong's account for which there was no apparent source other than the Blue Cross checks payable to Toney

jeopardize themselves with this agreement to do anything but tell the truth . . . .

*Id*. at 1383 n.2.  Defense counsel did not object.  In the government's closing, the prosecutor reiterated this argument with respect to both witnesses.  *Id*. at 1383.  This time, defense counsel objected, but was overruled.  *Id*.  Although the *Carroll* Court found that the improper statement was not "flagrant," it ordered a new trial anyway because the evidence of the defendant's guilt was not "overwhelming," defense counsel objected to the one of the prosecutor's statements, and the court did not cure the error.  *Id*. at 1390.

The government offered only one accomplice against Galloway, whereas prosecutors offered two in *Carroll*.  With an extra witness, one could argue that the *Carroll* prosecutors had their conviction reversed despite a stronger case than the one against Galloway, particularly since the *Carroll* prosecutors also had witnesses who identified the cocaine sold by the defendant to the Patricks.

Contrast *Carroll* with another case, *United States v. Toney*, 161 F.3d 404 (6th Cir. 1998),  in which we found that an improper prosecutorial remark was non-flagrant and declined to order a new trial because a proper curative instruction followed a defense objection and the evidence was "overwhelming."  *Id*. at 411-12.  Toney was prosecuted for participating in a scheme to defraud an insurance provider, Blue Cross, by cashing falsified benefit checks.  *Id*. at 405.  The government alleged Toney acted in cahoots with three of her neighbors, Kristen Armstrong, Yvette Petty, and Bridget Reardon.  *Id*. at 405.  All of the conspirators participated in receiving or cashing fraudulent benefit checks, along with another neighbor, Deborah Baker.  *Id*. at 405-06.  Blue Cross issued some of the benefit checks to Toney for full-time care she claimed to have provided her terminally ill father.  *Id*. at 406.  A jury convicted Toney of multiple counts of mail fraud.  *Id*. at 405.

(3) If you haven't been to Holland, why do you have guilders?[6]
(4) What did you purchase on your trip?
(5) Is this sweatshirt with "Amsterdam" written across the front the one you purchased?
(6) If you were not in Holland, then why are there train tickets from Brussels to Amsterdam in your bag?

We find nothing coercive about this line of questioning. Moreover, Galloway was standing the entire time and in plain view of other travelers, and not taken to a room or another part of the airport.

We further find no problem with the length of Galloway's detention.  First, the detention was only seven to ten minutes in duration.  This seven to ten minutes included not only Vaughn's questioning of Galloway, but of Kirsch as well. Regardless, even if the detention had been longer, we held in *Ozuna* that a defendant loses his expectation of brevity when he prolongs his non-custodial detention by lying. *Ozuna*, 170 F.3d at 659.  Ozuna lied to customs inspectors about his identity, thereby extending the duration of his detention, while they ascertained his identity.  Likewise, Galloway lied to Vaughn about the countries he had visited, thereby exposing himself to the possibility of a longer detention while inspectors searched for the truth.

Galloway lastly argues that his particular inspection was custodial because it was initiated by a canine alert. The Ninth Circuit has addressed this issue and found that the existence of probable cause is the determining factor as to when *Miranda* rights are needed at a secondary customs inspection:

We hold that the warning required in *Miranda* need not be given to one who is entering the United States unless and until the questioning agents have probable cause to

---

[6]The guilder was the basic unit of currency of the Netherlands at the time Galloway was there.  The euro has replaced the guilder as the basic unit of currency in the Netherlands as of January 1, 2002.

believe that the person questioned has committed an offense, or the person questioned has been arrested, whether with or without probable cause.  It is at that point, in border cases, that the investigation has "focused" in the *Miranda* sense.

*Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969).  We also believe this to be the proper standard.  A canine alert, however, does not constitute probable cause in a completely random setting, such as an airport, because of its questionable accuracy.  *United States v. Cook*, No. 89-5947, 1990 WL 70703, at *5 (6th Cir. May 29, 1990) (per curiam) (citing *United States v. Fernandez*, 772 F.2d 495, 498 n. 2 (9th Cir. 1985)) (stating that "the mere fact that a dog has 'hit' on a piece of baggage or cargo does not, in the absence of any factors supporting its reliability, establish probable cause").  Customs officials could not have arrested Galloway solely on the basis of the canine alert, absent a finding of drugs.  Vaughn discontinued the questioning when he found ecstacy in Kirsch's coat.  We believe that this is when probable cause existed for an arrest.  The Defendants were then arrested and properly read their *Miranda* rights.

Accordingly, even though Galloway may have personally been anxious about his secondary inspection in light of the fact that he was smuggling some 10,000 pills of ecstacy, we find that a reasonable man would have considered it rather routine airport security procedures, not at all akin to an arrest.  If we were to require *Miranda* warnings before the existence of probable cause, we would be requiring every customs inspector to read *Miranda* rights to each of the thousands of travelers subjected to primary or secondary inspection, even though the detention is often initiated by nothing more than the origin of the traveler's flight, if not totally at random.

In sum, we find that the nature of the secondary customs inspection is uncoercive and non-custodial, and remains such unless and until probable cause exists.  The vast majority of inspections lead to nothing, even when initiated by a canine alert.  The inspector asks routine questions, performs a routine

overwhelming means "overpowering."   *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1611 (1993).  The majority has to contend that the difference between Galloway's case and *Berger* is the difference between weak evidence and overpowering evidence, which is hard to accept.

A look at this Court's prior handling of a similar prosecutorial misconduct cases is also illuminating.  Our opinion in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), involves very similar legal issues to the case now before the Court.  In *Carroll*, the United States tried the defendant for various drug-related offenses.  *Id*. at 1382.  Robin Patrick and her husband, David Patrick, were the crucial witnesses.  *Id*.  The government's case consisted mostly of their eyewitness testimony, although other witnesses identified the cocaine that the defendant allegedly sold to the Patricks.  *Id*.  The prosecutor's closing statement included the following argument:

> Robin Patrick has already pled guilty.  She has not been sentenced.  She's facing ten to fifteen years in the penitentiary.  If she comes in here and she tells the truth, cooperates fully, the government may, meaning me, make a 5K1 motion, which allows the judge to sentence her . . . below the ten to fifteen years . . . .
> . . . .
> If she comes in here and lies, that agreement is void.  If she comes in here and gets on this witness stand and the judge believes she lied, she's jeopardizing herself further
> . . . .
> . . . .
> I submit to you that Robin and Ritchie Patrick are credible witnesses.  I submit to you that no person would

---

second series of questions (whether the evidence was overwhelming, whether there was an objection, and whether there was a limiting instruction) if the remark was not flagrant.  *Id.*  The comments in *Berger* may have qualified as flagrant, unlike the statement here, but this distinction does not address the strength of the evidence in the respective cases.

looked at him and was afraid to go over there, and when I waved my arm everybody started to holler, "Don't point at him." You know the rules of law. Well, it is the most complicated game in the world. I was examining *a woman that I knew knew Berger and could identify him, she was standing right here looking at him*, and I couldn't say, "Isn't that the man?" Now, imagine that! But that is the rules of the game, and I have to play within those rules.

*Id*. at 86-87 (emphasis in original). Thus, the prosecutor impermissibly claimed to know that Goldstein could identify Berger. Although the Court found that this remark, in light of the prosecutor's other inappropriate comments, warranted reversal, the Court noted that "[i]f the case against Berger had been strong, or, as some courts have said, the evidence of guilt 'overwhelming,' a different conclusion might be reached." *Id*. at 89.

*Berger* does not expressly define "overwhelming," and the above-quoted sentence is really *dicta*. It is significant, however, that the government's case "depend[ed] . . . upon the testimony of Katz, an accomplice with a long criminal record." *Id*. at 89. The Court characterized the government's case as "weak." *Id*.

The presence of corroborating evidence makes the case against Galloway somewhat stronger than the case against Berger, but *Berger* nevertheless shows the strain the majority places on the word "overwhelming," because both the case against Galloway and the case against Berger depend heavily on questionable accomplice testimony.[2]        Literally,

---

[2]*Berger* is also distinguishable because the prosecutor made several improper statements, although the Court focused on the most important one. The instant case involves the analysis of a non-flagrant prosecutorial remark. To determine flagrancy, this Court considers (1) whether the statement misled the jury or prejudiced the defendant; (2) whether the remark was isolated or part of a series of improper statements, (3) whether the remark was deliberate; and (4) the total strength of the evidence against the accused. *Francis*, 170 F.3d at 549-50. We only reach the

bag and body search and usually sends the traveler on his way. Accordingly, we affirm the decision of the district court and find there was no *Miranda* violation.

### III.   Prosecutorial Misconduct

Next, Galloway claims he is entitled to a new trial because the prosecutor made improper statements during his closing argument. Galloway's principal defense throughout his trial was that Kirsch acted alone in carrying the ecstacy into the United States; and that she was not merely Galloway's mule as she had testified. Galloway attempted to refute Kirsch's assertion that she was a mule by intimating, through cross-examination of Government witnesses, that had Kirsch been a mule, he would not have accompanied her on the flight and through customs. Instead, he would have sent her alone or watched from a distance. In its closing argument, Government counsel attempted to refute this defense, stating:

I have tried several cases myself where we see the mule term, and we have a defendant who claims he or she is a mule, and I have had several cases where, kind of like the bodyguard scenario, where the individual who is responsible for the drugs travels with the individual carrying the drugs.

Trial, Nov. 28, 2000 at Tr. 65. Galloway claims this statement is improper because the prosecutor injected his own personal knowledge into the case, and he therefore is entitled to a new trial.

When reviewing a claim of prosecutorial misconduct based on improper statements, we employ a two-part test. *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994). The first part of the test is to determine whether the remarks were indeed improper. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999); *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986). If they were improper, we must determine if the remarks were flagrant and warrant reversal. *Francis*, 170 F.3d at 549 (citing *Carroll*, 26 F.3d at 1388). There are four factors that we utilize to determine if an

improper statement was flagrant: 1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong. *See Francis*, 170 F.3d at 549-50; *Carroll*, 26 F.3d at 1385 (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). None of these factors is dispositive, but even if we do find the improper statement was not flagrant, we will nonetheless reverse a conviction upon a determination that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense objected to the statements; and 3) the trial judge did not cure the impropriety through an admonishment to the jury. *Francis*, 170 F.3d at 550; *Carroll*, 26 F.3d at 1385-86 (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)).

The only allegation of misconduct before us is the Government's statement during closing arguments. Since a prosecutor cannot express his personal opinions before the jury, his statement tending to give credence to Kirsch's recitation was necessarily improper. *See, e.g.*, *Gall v. Parker*, 231 F.3d 265, 312 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001).

Upon finding that the statement was improper, we must determine whether the statement was flagrant. In utilizing the *Leon* balancing test, we find the prosecutor's statement was isolated in nature. Galloway raises only one issue of prosecutorial misconduct, and does not allege that the trial was riddled with improper statements. *Cf. Gall*, 231 F.3d at 312 (stating how prosecutorial misconduct was pervasive at all stages of trial). Moreover, we find no evidence that the statement was deliberate, and we find that it was not made with intent to prejudice the defendant. *See Carroll*, 26 F.3d at 1389-90 (stating that remark was not deliberate when no evidence existed to indicate otherwise). Accordingly, we find the improper remark was not flagrant.

*United States (Berger II)*, 295 U.S. 78 (1935), *overruled in part on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960), has the Supreme Court suggested that an "overwhelming" case might mitigate the problems caused by an improper prosecutorial comment. *Id*. at 89. *Berger* thus provides meaningful guidance in our attempt to determine whether the case against Galloway was "overwhelming."

In *Berger*, the indictment charged the defendant, Berger, with having conspired with seven others to utter counterfeit federal reserve notes. *Id*. at 79-80. The indictment also contained eight additional substantive counts and named other defendants, including Katz, Rice, and Jones. *Id*. at 80. Katz accepted a guilty plea on the conspiracy count and testified for the government at the trial in exchange for a *nolle prosequi* on the substantive counts. *Id*. Berger was convicted only of conspiracy, while his co-conspirators were convicted of the substantive offenses. *Id*. at 88.

According to the Court, the evidence "tended to establish not a single conspiracy as charged but two conspiracies—one between Rice and Katz and another between Berger, Jones and Katz." *Id*. The only link between the two groups was that each was connected with the same fraudulent notes. *Id*. There was no evidence that Berger conspired with Rice and Katz. *Id*. at 80.

Katz was the only witness who testified to Berger's alleged role in the Berger-Jones-Katz conspiracy. *See United States v. Berger (Berger I)*, 73 F.2d 278, 279 (2d Cir. 1934) (L. Hand, J.) (explaining the facts in greater detail), *rev'd by United States v. Berger (Berger II)*, 295 U.S. 78. The prosecution also introduced a woman, Goldie Goldstein, to identify Berger as a member of the Berger-Jones-Katz scheme, but when on the stand, she had difficulty doing so. *Berger II*, 295 U.S. at 86. Reflecting a pattern of "undignified and intemperate" behavior, the prosecutor argued:

> Mrs. Goldie Goldstein takes the stand. She says she knows Jones, *and you can bet your bottom dollar she knew Berger*. She stood right where I am now and

worked as Galloway's "mule," meaning that Kirsch carried the drugs (and assumed the risk of arrest) for Galloway. A reasonable person might reach the intuitive conclusion that it would defeat the purpose of the mule-boss relationship if the boss (allegedly Galloway) traveled with the mule (allegedly Kirsch).

As quoted above, the majority lists four other pieces of evidence, none of which conclusively establishes Galloway's guilt. First, Galloway paid for Kirsch's tickets and transportation. Galloway, however, claimed that Kirsch was his girlfriend, which could explain his generosity. Second, Galloway had Kirsch's passport, baggage claim stub, and tickets, but it is similarly reasonable that someone might carry various papers for his girlfriend. Third, he paid cash for everything and told the travel agent to indicate that he paid by check. This is genuinely suspicious behavior. Finally, Galloway lied to the customs officials about his trip to Amsterdam. Perhaps he denied visiting Amsterdam because he had used drugs while there and became frightened when airport drug dogs alerted to his luggage. Regardless, his attempt to mislead the customs officials is also clearly suspicious behavior. Taken as a whole, therefore, the government's case consists of Kirsch's highly motivated testimony, corroborated by several instances of suspicious behavior. Under *Francis*, we must initially ask whether this is "overwhelming" evidence against Galloway. 170 F.3d at 550.

To do so, we must first decide what constitutes an "overwhelming" case. Neither the Supreme Court nor any lower court has explained precisely what quantum of evidence is "overwhelming" enough to make prosecutorial misconduct effectively harmless error, at least when combined with an objection and curative instruction.[1] Only once, in *Berger v.*

---

[1]Unsurprisingly, the majority neglects to define "overwhelming," which is the pivotal term. Leaving "overwhelming" ambiguous makes disparate application of *Francis* inevitable because courts can employ the language whenever necessary to reach the outcome they desire.

Under *Bess*, we will reverse the conviction only if: 1) the other evidence is not overwhelming; 2) Galloway objected at trial; and 3) there was no curative admonishment by the judge. *See Bess*, 593 F.2d at 757. Galloway objected immediately after the prosecutor's statement and the judge sustained the objection, stating: "Sustained. No evidence. Move on." Galloway did not ask for further instruction. We have held that for a curative admonishment to be sufficient, it must be swift and in proportion to the potential harm. *See United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991) (indicating that the timing of the admonition is more important than the firmness); *see also Bess*, 593 F.2d at 757. Here, the judge expressed disapproval of the prosecutor's statement immediately upon the objection. *Cf. Solivan*, 937 F.2d at 1157 (holding that an admonition that came after a twenty minute break was not swift enough for curative instruction to be sufficient because improper statement had been "etched in granite" in the jurors' minds). Moreover, we find his admonition was sufficiently firm to ameliorate the non-flagrant conduct. *Cf. id.* Accordingly, we hold this admonition, although brief, satisfies the curative instruction requirement under *Bess*.

Moreover, even without a curative instruction, we find the requirements of *Bess* are satisfied because the other evidence against Galloway was overwhelming. Galloway paid cash for everything— the airfare, the hotel, and the train— for both himself and Kirsch. Furthermore, he used two travel agents in planning the trip, paying for all arrangements in cash, yet asking each travel agent to indicate that he had paid by check. Also, he had possession of Kirsch's passport, baggage claim stub, and tickets upon their arrival in Cincinnati. Lastly, Galloway repeatedly lied about the fact that he had been to Amsterdam. In total, the evidence against Galloway, notwithstanding the prosecutor's improper statement, is vast.

Accordingly, we find that the prosecutor's statement, though improper, does not warrant a reversal of the conviction and a new trial.

## IV.    Ineffective Assistance of Counsel

Next, Galloway claims his counsel was ineffective. He asserts that his counsel caused him prejudice when he questioned Kirsch about Galloway's tattoo because it tended to indicate that Galloway advocates the use of drugs.[7]

We have held that ineffective assistance of counsel claims are generally not heard on direct review. *See United States v. Shabazz*, 263 F.3d 603, 612 (2001); *United States v. Jackson*, 181 F.3d 740, 747 (6th Cir. 1999). Such issues are usually heard only on habeas petitions under 28 U.S.C. § 2255. *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999). We generally do not hear such claims on direct review because, for the most part, the record before us will be insufficient to enable us to entertain the claim, because a successful claim necessarily requires a showing of prejudice, as enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997). We find the record in this case no different.

Accordingly, we decline to address the issue of ineffective assistance of counsel.

### V. Conclusion

For the foregoing reasons, we uphold the decision of the United States District Court for the Eastern District of Kentucky, and **AFFIRM** Galloway's conviction and sentence.

---

[7]Galloway's tattoo contains the concealed inscription "LSD" in an elaborate pattern on his back. Galloway's counsel asked about, and Kirsch testified to, its existence. *See also, supra*, note 2.

---

### DISSENT

---

CLAY, Circuit Judge, dissenting. We explained in *United States v. Francis* that, "[t]o reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury." 170 F.3d 546, 550 (6th Cir. 1999); *see also United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979) (articulating this test). Since the government lacked an "overwhelming" case and the trial court did not offer a curative instruction, I respectfully dissent.

The majority amply summarizes the case against Galloway, which, they claim, is "vast." As the majority explains,

Galloway paid cash for everything—the airfare, the hotel, and the train—for both he and Kirsch. Furthermore, he used two travel agents in planning the trip, paying for all arrangements in cash, yet asking each travel agent to indicate that he had paid by check. Also, he had possession of Kirsch's passport, baggage claim stub, and tickets upon their arrival in Cincinnati. Lastly, Galloway repeatedly lied about the fact that he had been to Amsterdam.

In addition to this evidence, the prosecution also offered the testimony of Kirsch, the woman caught with the drugs. Kirsch told the jury that she worked as Galloway's "mule," or his subordinate responsible for physically carrying narcotics that actually belonged to Galloway.

The case has some weaknesses. Kirsch, the government's only witness, had an obvious motive to lie—she exchanged her testimony for a substantially reduced sentence. Customs agents found the drugs on Kirsch, not Galloway. Furthermore, the prosecutors hypothesized that Kirsch