**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sanjeev Kumar GUPTA, Defendant–
Appellant.**

No. 98–3843.

United States Court of Appeals,
Seventh Circuit.

Argued April 27, 1999.

Decided June 29, 1999.

Richard A. Bierschback (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, Diane MacArthur, Office of the United States Attorney, Chicago, IL, for Plaintiff-Appellee.

Frederick F. Cohn (argued), Chicago, IL, for Defendant-Appellant.

Before ESCHBACH, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Arriving at O'Hare Airport from abroad, Sanjeev Gupta gave the immigration inspector three passports: his own and those of his wife and son. Gupta told the inspector that the people accompanying him were his wife and child. The INS computer flagged Gupta for secondary inspection, and in an interview room Gupta repeated his assertion that the woman and child were his relatives. Inspector Werderitch did not believe this (the pictures on the passports did not quite match the travelers), and Gupta soon confessed that he had been paid $8,000 to smuggle the woman and boy into the United States. Gupta next made a sworn statement embodying this admission. At this point criminal investigators arrived, gave *Miranda* warnings, obtained from Gupta a written waiver of his rights, and took a new statement in which Gupta repeated almost verbatim what he had told Inspector Werderitch. The criminal investigators read Gupta the questions Werderitch had asked and the answers Gupta had given, asking if he still wanted to make the same statement. In most cases Gupta did, although he modified a few of the answers. An indictment charging Gupta with smuggling aliens into the United States for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), has been followed by a conviction and a sentence of three years' imprisonment.

The only question on appeal is whether the district judge should have suppressed Gupta's confession to the criminal investigators. The district judge suppressed all statements he made to Inspector Werderitch, ruling that Gupta was "in custody" and therefore should have received *Miranda* warnings before Werderitch began asking questions. Because the criminal investigators delivered the necessary warnings and obtained a formal waiver, however, the district judge applied *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which holds that *Miranda* warnings break the causal chain and permit a later confession to be used, provided that the earlier statements were voluntary. The judge found that Gupta's statements to Werderitch were voluntary and that Gupta knowingly waived the con-

stitutional rights explained in the *Miranda* warnings. Gupta does not challenge either of these conclusions. Nonetheless, he insists, *Elstad* does not govern because the interval between the confessions was so short, and the statements to the criminal investigators were so closely based on the statements to Werderitch.

Defending the judgment, the United States advances an argument that would support the use of all three confessions: that Gupta was not "in custody" because no one brandished a weapon or told him that he was not free to leave. The two factual statements are true, but the conclusion does not necessarily follow. Gupta certainly was not free to leave. He was at an immigration checkpoint in an international airport, the functional equivalent of the border, *Almeida–Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), seeking entry into the United States. He could not enter the United States without permission from the INS. And he could not go back the way he had come. Planes do not depart from the international-arrivals section of O'Hare. In order to leave the United States, Gupta had to reach the departures section of the airport, something he could do only if the INS admitted him, or if he remained in the custody of the INS during the transit.

■ A different, and more difficult, question is whether these restraints are the *sort* of "custody" that require *Miranda* warnings. Not all custody qualifies. A prisoner may testify in court without a recitation of *Miranda* warnings. Cf. *United States v. Washington,* 431 U.S. 181, 186, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) (reserving the question whether warnings are required before grand jury testimony). *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), used the word "custody" to denote the kind of surroundings that can have a coercive effect. See, e.g., *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Oregon*

*v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Potential coercion or compulsion is vital to *Miranda*'s application, because the clause underlying its framework is the privilege against compulsory self-incrimination. Counsel is provided only to help the suspect understand his privilege; *Miranda* does not rest on the counsel clause of the sixth amendment. See *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Thus *Miranda* warnings are unnecessary either when there is little risk of compulsory self-incrimination, see *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (for purposes of *Miranda,* "custody" does not begin during a traffic stop until formal arrest, even if the driver's freedom had been restrained earlier in the process), or when the privilege itself does not apply.

■ *Miranda* therefore is a mismatch for the immigration process, at least at the outset. No one believes that the Constitution requires the immigration inspector to greet new arrivals by saying: "Welcome to the United States. You have a right to remain silent. Anything you say may be used against you. You have a right to counsel and, if you cannot afford a lawyer, one will be appointed for you. Now, please let me see your passport." A person seeking entry into the United States does *not* have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel. The United States is entitled to condition entry on willingness to provide essential information. No information, no entry. Refusing to extend the boon of entry to those who remain silent can be seen as "compulsion" in the sense that it is a (potentially steep) price tag for remaining silent, yet the government's right to insist on information as a condition of entry cannot reasonably be denied. As a result, the fifth amendment

privilege no more applies to these questions than the fourth amendment blocks the inspection of parcels at the border. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Having begun to speak, moreover, the person desiring entry cannot readily claim a privilege in order to present a half-true story. See *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). Not surprisingly, therefore, many courts have held that persons seeking entry at the border may be questioned without *Miranda* warnings, even though they are also subject to custody until they have satisfied the INS of their right to enter. See, e.g., *United States v. Ozuna,* 170 F.3d 654, 657–59 (6th Cir.1999); *Cuban American Bar Association, Inc. v. Christopher,* 43 F.3d 1412, 1427–29 (11th Cir.1995); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1448–50 (9th Cir.1995) (reasoning that applicants are at least figuratively "outside the United States" until the INS approves their entry); *United States v. Layne,* 973 F.2d 1417, 1420 (8th Cir.1992); *United States v. Bengivenga,* 845 F.2d 593, 598–99 (5th Cir.1988) (en banc).

▬ Much more difficult is the question when—not whether, but when—the criminal investigation is far enough advanced that the privilege offers some protection, and a detailed inquiry into "custody" becomes necessary. Just as it is certain that the routine questions asked of travelers at the border do not violate the Constitution, so it is certain that a person denied admittance to the United States, but prosecuted for crimes committed in the process of seeking entry, cannot be compelled at trial to incriminate himself. Where between the two extremes is the line drawn? Cases such as *United States v. Ventura,* 85 F.3d 708, 711 (1st Cir.1996), which holds that *Miranda* warnings are not necessarily required for secondary inspection, recognize that a line must be drawn but do not help locate it. The district court's ap-

proach in this case, which drew the line at the point where the INS acquired enough suspicion to commence a criminal investigation, cannot readily be reconciled with *Berkemer,* which drew the line at *arrest* rather than at the accumulation of probable cause for arrest. Cf. *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). If formal arrest is the right line, as *Berkemer* suggests, or if the arrival of criminal investigators supplies the demarcation (another possibility), then none of Gupta's statements was subject to exclusion. But we need not come to closure on the subject, because we agree with the district court that *Elstad* entitles the prosecutor to use the statements to the criminal investigators, even if the statements to Werderitch properly were suppressed.

Suspects are not imprisoned in their privileges. They are free to make statements if they want. *Miranda* devised its warnings to provide the knowledge the Court deemed essential to a voluntary waiver of the privilege against compulsory self-incrimination. If a suspect possessed of that knowledge freely waives the privilege and elects to give a statement, then there is no constitutional objection to its use. *Elstad* holds that a suspect's willingness to waive the privilege and make a statement without the benefit of the *Miranda* warnings does not imply that a statement following the warnings (and a formal waiver) is a result of compulsion. Knowledge that a suspect is willing to make a statement with or without warnings—and to repeat the statement, even after a refresher of *Miranda* warnings—may demonstrate that the statement is more rather than less reliable. The court can be confident that the waiver of rights is knowing and intelligent. If the first statement was involuntary, then the second likewise may be tainted; a victim of arm-twisting tactics may not believe that the *Miranda* warnings offer a real choice. Gupta's arm was not twisted, however, and nothing in the rationale of *Elstad* implies that the temporal proximity (or similarity) of the pre- and post-*Miranda*-warning

statements makes the latter any the less valid. Quite the contrary, we should think. A suspect's willingness to make exactly the same statement a second time, following an advice of rights and a written waiver that drives home the seriousness of the steps about to be taken, demonstrates that the suspect is set on his course, and thus that the statement cannot be attributed to "compulsion" in violation of the Constitution.

A competing inference might be that a suspect, having given an incriminating statement, does not think that silence thereafter could be of any benefit, and therefore ignores the *Miranda* warnings unless told explicitly that the first statement cannot be used against him. But this line of argument would require *Elstad* itself to come out the other way, for Elstad did not receive such advice. Requiring advice of this kind also would be unrealistic; how is one interrogator going to know whether, some months or years later, a court will suppress the statements made to a prior questioner? So there is no pertinent difference between this case and *Elstad*. Gupta's statements to the criminal investigators were admissible in evidence.

AFFIRMED.