**UNITED STATES of America,**

v.

**Long Tong KIAM.**

**No. CRIM.04–436.**

United States District Court, E.D. Pennsylvania.

Oct. 22, 2004.

As Amended Nov. 4, 2004.

Stephen J. Britt, Donnelly & Associates, Conshohocken, PA, for Defendant.

Barry Gross, Assistant United States Attorney, Philadelphia, PA, for Plaintiff.

*MEMORANDUM*

DALZELL, District Judge.

Defendant Long Tong Kiam, a citizen of Singapore, seeks to suppress a confession he gave to Immigration and Customs Enforcement ("ICE") Special Agent Richard Kozak on April 27 of this year. He predicates his suppression claim on *Missouri v. Seibert,* —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court's June 28, 2004 opinion in which the Court held unconstitutional certain kinds of "two-round" interrogation strategies designed to sidestep *Miranda.*

Kiam's motion requires us to resolve two issues. First, we must determine whether *Miranda* applies to a custodial interrogation when officials at ports of entry to this country have the dual purpose of determining an alien's admissibility into the United States and conducting a criminal investigation. Second, assuming *Miranda* applies, we must consider whether *Seibert* mandates that we suppress Kiam's confession.

Given that these questions arise in a fact context far removed from what the Supreme Court considered in *Seibert,* we necessarily must analyze them at some length.

**A. *Factual and Procedural Background***

On the weekend of April 24 and 25, 2004, Customs and Border Protection ("CBP") agents unraveled three or four nearly identical alien smuggling schemes.[1] In each, a Singaporean national, with a valid Singaporean passport, guided three or four Chinese nationals, all with fake or recycled Singaporean passports, on international flights into Philadelphia International Airport.

CBP Senior Inspector Daniel Roman is responsible for investigating criminal activities and inspecting international travelers who come to Philadelphia International Airport. He identifies himself as a law enforcement officer and carries a firearm when on duty.

On April 27, 2004, Roman orchestrated an investigative *coup de maître.* Reviewing the manifest of U.S. Airways Flight 893 from Frankfurt, Germany, he discovered that, like all of the flights involved in the plots the preceding weekend, Flight 893 also had four passengers, each carry-

---

1. We draw these facts from the testimony at the October 20, 2004 suppression hearing of the two investigating agents in this case, Customs and Border Patrol Senior Inspector Daniel Roman and ICE Senior Special Agent Richard Kozak.

ing a Singaporean passport. Also, like the weekend plots, one passenger, defendant Long Tong Kiam, sat alone, while three sat together. Roman testified that this "set off alarms" in his mind when he reviewed the manifest while Flight 893 was en route to Philadelphia.

Thus, upon Flight 893's arrival at the gate at 3:14 p.m., before any passengers disembarked, CBP agents entered the plane, had airline personnel identify Kiam and the three Chinese nationals, and then "escorted"[2] them to a secondary detention area, isolated from public view. The agents immediately detained Kiam alone in an interrogation room.[3]

At about 3:35 p.m., Inspector Roman entered the room, closed the door, and began questioning Kiam. While Roman testified that the sole purpose of his interrogation was to determine Kiam's admissibility, from the outset he had a "particularized suspicion" that Kiam was an illegal alien smuggler. Roman also testified that he knew the Government would charge at least one of the smugglers from the previous weekend with the crime of alien smuggling, which it indeed did three days later. *See United States v. Lam,* Cr. No. 04–304 (E.D.Pa. Apr. 30, 2004).

In English, Roman asked Kiam questions relating to his alleged alien smuggling scheme for the purpose of exposing inconsistencies in his story. Roman soon caught Kiam in two lies. First, Kiam denied recently traveling to Thailand, Turkey, and Europe, while his passport—by the entry stamps on it—reflected otherwise. Second, Kiam denied knowing the three Chinese nationals, but they claimed otherwise. Confronting Kiam with these inconsistencies, Kiam, after just twenty-five minutes,[4] admitted that he in fact did know the Chinese nationals and illegally helped them enter this country. This assistance would constitute a criminal violation of 8 U.S.C. § 1324(a)(2)(B)(ii).

Upon Kiam's admissions, Roman ended the interrogation. At around 4:00 p.m., he called the office of ICE Senior Special Agent Richard Kozak, ICE's representative to the Asian division of our United States Attorney Office's Organized Crime Strike Force. Kozak's office relayed Roman's request to Kozak, who forthwith called Roman. This 4:00 p.m. conversation was the first time that the two ever discussed Kiam.

Kozak then drove to the airport, arriving at about 4:50 p.m. He proceeded to the secondary detention area, talked with Roman, and saw Kiam and the three Chinese nationals separated from each other. He next called Mr. Stephen Wong, a Chinese translator[5] who was in Manhattan, and

---

**2.** From the testimony at the hearing and the documents both parties filed, it is unclear whether the agents directed Kiam and the Chinese nationals to accompany them or physically forced them to do so.

**3.** According to the testimony of ICE Senior Special Agent Richard Kozak, Kiam was "unfree" to leave.

**4.** We heard contradictory testimony regarding the length of Roman's interrogation of Kiam. While Roman testified that the interrogation "maybe" lasted one hour, it was impossible for him to begin the interrogation until about 3:35 p.m. because it takes a few minutes to

walk from the gate to the secondary detention area. Also, Roman testified that he began interrogating Kiam shortly after 3:30 p.m. ICE Senior Special Agent Richard Kozak testified that he spoke with Roman at approximately 4:00 p.m., and Roman testified that, when he called Kozak, the interrogation had already ended. We find that the first interrogation lasted about twenty-five minutes.

**5.** Wong testified that he is a certified interpreter who has translated in federal court since 1991. He regularly translates various Chinese dialects, including Guandonghua (Cantonese), Fuzhouhua (the dialect of Mainland China's southern Fuzhou province), and

requested that Wong remain available via telephone.

At around 5:10 p.m., Kozak entered the room and introduced himself to Kiam. Kozak then called Wong, who spoke on a speaker phone. Wong testified that he and Kiam then began discussing in Mandarin Chinese which Chinese dialect Kiam felt most comfortable using.[6] Surprising Wong, Kiam emphasized that he is well-versed in Mandarin, Cantonese, Fuzhouhua, Hainanese, English, and Bahasa, the official language of Indonesia. Of this assortment, Kiam told Wong that he preferred to speak English.

Next, Kozak gave Kiam *Miranda* warnings. Despite Kiam's English preference, Wong methodically ensured that Kiam understood each sentence of the warnings. For instance, after Kozak read aloud each sentence, Wong asked Kiam in Mandarin whether he understood, providing additional explanation when necessary. When Kozak finished explaining these rights at 5:18 p.m., Kiam waived them, memorializing this on an ICE I–214 form.

From 5:18 to around 8:15 p.m., Kozak questioned Kiam about his alien smuggling plot.[7] Kozak took a different interrogation approach than what Roman used. While Roman provoked admissions by confronting Kiam with inconsistencies in his story, Kozak sought to motivate Kiam to paint a comprehensive picture of his smuggling plot. Kozak succeeded. In his confession, Kiam, among other things, identified the mastermind behind the plot (a man named Lawrence); the places where he met Law-rence; the details of each conversation he had with Lawrence; the amount of his compensation; the facts surrounding his first alien smuggling plot; the contacts Kiam had with Lawrence's European underlings; the first meeting Kiam had with the Chinese nationals; the account of their actions between that first meeting and their April 27, 2004 apprehension; and the fact that Kiam suspected that his actions were illegal. Def.'s Mem., Ex. A, at 1–3.

Toward the end of the interrogation, Kozak reduced Kiam's confession to writing. Kozak reviewed it with Kiam, and allowed Kiam to amend it by adding on page three, "I truly regret the problems my trip here has caused. I hope that I am not barred from reentering the UNITED STATES in the future." *Id.* at 3.

Instead of barring Kiam from reentering, the United States refused to let him leave. On May 3, 2004, a Grand Jury indicted Kiam on three counts of alien smuggling, alleging violations of 8 U.S.C. § 1324(a)(2)(B)(ii). With trial scheduled to begin on November 1, 2004, Kiam filed this motion to suppress his confession. For the reasons that follow, we shall deny Kiam's motion.

### B. *Legal Analysis*

As noted at the outset, we must resolve two issues here. First, we must decide whether *Miranda* applies to a custodial interrogation when customs officials have the dual purpose of determining an alien's admissibility into the United States and

---

Putonghua (Mandarin), the most prevalent dialect spoken by ethnic Chinese.

**6.** According to the Central Intelligence Agency, Singapore is a linguistic melting pot. Its official languages are Chinese, Malay, Tamil, and English. *See* Central Intelligence Agency, The World Factbook, Singapore, *at* http://www.cia.gov/cia/publications/factbook/geos/sn.html (last accessed Oct. 21, 2004). This reality may explain why Kiam is, in translator Wong's estimation, a polyglot.

**7.** While Wong did not stay on the line throughout the entire interrogation, he did remain available. After their initial conversation, Wong and Kiam spoke three or four more times.

conducting a criminal investigation of that alien. Second, assuming *Miranda* applies, we must consider whether the Supreme Court's recent decision in *Missouri v. Seibert*, — U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), mandates that we suppress Kiam's confession.

### 1. *Miranda's Applicability*

■ Before June 28, 2004, to sidestep *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), many law enforcement officers used a two-round interrogation strategy. *See Seibert*, — U.S. at ————— & n. 2, 124 S.Ct. at 2608–09 & n. 2. In round one, the officer would interrogate the suspect, providing no *Miranda* warning. *Id.* Once this interrogation yielded a confession, in round two the officer would give the *Miranda* warning and cover the same ground a second time, this time hoping that the suspect's round one, unwarned statements would loosen his tongue. *Id.* This interrogative stratagem enabled law enforcement officers formally to satisfy *Miranda*, while escaping its procedural inconvenience.

Noting that "[t]he question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted," *id.* at 2613, on June 28, 2004, the Supreme Court held this tactic to be unconstitutional. *See Seibert*, — U.S. at ——, ——, 124 S.Ct. at 2613, 2616.[8] Here, Kiam argues that *Seibert* mandates that we suppress what he calls his round two confession. For us to agree with him, we must first determine whether his round one interrogation triggered *Miranda*.

Law enforcement officers must provide *Miranda* warnings before subjecting a suspect to custodial interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104

S.Ct. 3138, 82 L.Ed.2d 317 (1984). The custodial interrogation inquiry requires courts to consider two subsidiary components: (1) custody and (2) interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.").

The custody determination is the first and, often, the central inquiry: it is "the touchstone to the need for *Miranda* warnings." *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir.1987). As our Court of Appeals recently noted, whether one is in custody depends on whether law enforcement significantly restricts one's freedom:

> Ordinarily, in determining whether an individual is in custody, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. When the individual has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.

*Reinert v. Larkins*, 379 F.3d 76, 86 (3d Cir.2004) (internal citations and quotation marks omitted). Hence, in determining whether a suspect was in custody, courts should examine all of the circumstances surrounding the interrogation, objectively considering "how a reasonable man in the suspect's position would have understood his situation." *Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

---

**8.** We more fully discuss *Seibert* in Part B.3.

In its response to Kiam's motion and in the hearing we held, the Government never seriously contested that it held Kiam in custody. This is unsurprising. According to the testimony of Senior Inspector Roman, before any Flight 893 passengers disembarked, CBP agents entered the plane, had airline personnel identify Kiam, and then "escorted" Kiam to the secondary detention area. The agents isolated Kiam in an interrogation room away from the public view. Next, Roman, who characterizes himself as a "law enforcement officer" and carries a firearm, entered the room, closed the door, and began questioning Kiam. Special Agent Kozak testified that, throughout this period, Kiam was "unfree" to leave. These circumstances compel us to conclude that "a reasonable man in [Kiam's] position would have understood" his freedom to be significantly restricted. *Stansbury*, 511 U.S. at 324, 114 S.Ct. 1526 (quoting *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138).

█ Having considered the custody part of the *Miranda* inquiry, we now turn to the second part, interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Our Court of Appeals has emphasized that "interrogation" refers not only to express questioning but also its functional equivalent: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Calisto*, 838 F.2d 711, 716 (3d Cir.1988) (quoting *Innis*, 446 U.S. at 301, 100 S.Ct. 1682).

Here, Inspector Roman questioned Kiam for about twenty-five minutes. While we do not know the exact questions Roman asked, we do know two things. First, Roman caught Kiam in two apparent lies: Kiam denied recently traveling to Thailand, Turkey, and Europe, while his passport reflected otherwise, and Kiam denied knowing the three Chinese aliens, but the aliens themselves contradicted this ignorance. Second, Roman's questions induced Kiam to confess to him certain details of the crimes with which he is now charged. Thus, we conclude that Roman "interrogated" Kiam for purposes of *Miranda*.

We now consider whether *Seibert* mandates the suppression of Kiam's round two confession.

### 2. *The Government's Argument that Miranda Is Inapplicable*

█ We first address the Government's claim that *Miranda* does not apply to this case because Kiam was an alien seeking entry into the United States. Specifically, the Government contends that *Seibert* applies only when law enforcement personnel conduct two rounds of custodial interrogation under *Miranda*, and it never subjected Kiam to a round one interrogation that triggered *Miranda*; therefore (so the argument goes) *Seibert* was inapplicable to round two.

The Government argues that it never subjected Kiam to a round one interrogation triggering *Miranda* because Kiam was an alien seeking entry into the United States. It contends that customs agents "routinely questioned [Kiam] as to his admissibility to enter the United States as are all arriving aliens." Gov.'s Resp. to Def.'s Mot. to Suppress Statement Against Interest at 5.[9] Moreover, when they are

9. As the Government correctly notes, aliens seeking entry into the United States carry the burden of proving their fitness to enter: "Each alien ... must establish to the satisfac-

routinely questioned, aliens lack the right to remain silent: "[T]he fifth amendment privilege no more applies to these questions than the fourth amendment blocks the inspection of parcels at the border." *United States v. Sanjeev Kumar Gupta,* 183 F.3d 615, 617–18 (7th Cir.1999); *see also United States v. Ozuna,* 170 F.3d 654, 658–59 (6th Cir.1999); *United States v. Layne,* 973 F.2d 1417, 1420 (8th Cir.1992). Thus, the Government argues, Roman's interrogation of Kiam did not constitute a round one *Miranda* interrogation, which precludes *Seibert's* application to round two.

The Government's argument misses the mark. In the cases it cites, the courts emphasized that the questions customs agents asked were routine in nature. In *Ozuna,* 170 F.3d at 658, for example, after noting that "Other courts have held consistently that the *Miranda* warnings need not precede initial *routine questioning* by Immigration or Customs officials," (emphasis added), Judge Carr wrote, "Here, though the questioning lasted over an hour, there is no indication that defendant was asked anything other than *routine questions.*" *Id.* at 659 (emphasis added). Accordingly, the Sixth Circuit endorsed the admission of an alien defendant's confession to customs agents.

Similarly, in *United States v. Layne,* 973 F.2d 1417, 1420 (8th Cir.1992), the Court wrote, *"Routine questioning* by customs officials is normally not custodial interrogation that triggers a *Miranda* warning" (emphasis added). After noting that the defendant "voluntarily came to the border

tion of the inspecting officer that the alien is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations, and is entitled, under all of the applicable provisions of the immigration laws and this chapter, to enter the United States." 8 C.F.R. 235.1(d)(1) (2004).

and was asked *routine administrative questions* to determine her admissibility into the United States," *id.* (emphasis added), the Eighth Circuit held that the district court correctly refused to suppress the defendant's incriminating statement to customs agents. *Id.* at 1421.

Finally, in *Gupta,* 183 F.3d at 616, Judge Easterbrook, writing for the Seventh Circuit, noted that "[t]he district judge suppressed all statements [Gupta] made to [Customs] Inspector Werderitch, ruling that Gupta was 'in custody' and therefore should have received *Miranda* warnings." While the court never ruled on that part of the district court's decision, it did emphasize that the lack of *Miranda* protection afforded to incoming aliens applies only to routine biographical information:

A person seeking entry into the United States does *not* have a right to remain silent; the immigrant must honestly describe his *identity, nationality, business, and claim of entitlement to enter,* and must do this without the aid of counsel. The United States is entitled to condition entry on willingness to provide *essential information.* No information, no entry.

*Id.* at 617 (second and third emphases added).

Thus, in each case the Government cites, the court underscored that the questions customs agents asked were *routine* in nature. Furthermore, in none of the cases did the agent have a particularized suspicion that the alien had engaged in criminal conduct.[10]

10. Our review of additional cases confirms that other federal courts also find this difference to be crucial. *See, e.g., United States v. Bengivenga,* 845 F.2d 593, 599 (5th Cir.1988) (en banc) (*"Routine citizen checks* at fixed checkpoints do not impose a degree of restraint associated with arrest because the de-

While it is indeed well established that aliens seeking to enter our borders must answer routine questions, Inspector Roman's questions were far from run-of-the-mill. From the outset, Roman questioned Kiam under the dual lens of admissibility into the United States *and* of a criminal investigation of alien smuggling. He testified that, when he began interrogating Kiam, he had a "particularized suspicion" that Kiam was an illegal alien smuggler. He had this suspicion, Roman testified, because, on the weekend just before Tuesday, April 27, 2004, CBP agents uncovered three or four "identical" plots. In each of these plots, a Singaporean smuggler with a valid Singaporean passport escorted about three Chinese nationals—with fake or recycled Singaporean passports—into the Philadelphia International Airport. Roman testified that, at the time he interrogated Kiam, he knew that, just two days earlier, the Government arrested one of these Singaporean smugglers.

Roman singled out Kiam, of all of the passengers on Flight 893, for immediate apprehension because Kiam's situation raised all of the red flags that Roman witnessed in the preceding weekend's plots. Then, in the interrogation, Roman asked Kiam questions specifically concerning the alien-smuggling plot he suspected to be afoot on Flight 893. These questions induced Kiam to confess after just twenty-five minutes. Kiam would not have confessed to smuggling the Chinese nationals absent Roman's highly focused questions.

Thus, we conclude that Roman, a seasoned immigration official, at the very least knew of a real likelihood that the Government would criminally prosecute Kiam.[11] The Government's characterization of its initial interrogation of Kiam as the kind of "routine" questioning, to which any international tourist would be subjected, simply fails when measured against what Roman testified actually happened. Consequently, *Miranda* applied to round one of Kiam's interrogation, and *Seibert* was in play for round two.

### 3. *Missouri v. Seibert*

In *Missouri v. Seibert,* —— U.S. ——, ——, 124 S.Ct. 2601, 2613, 159 L.Ed.2d 643 (2004), a plurality opinion—endorsed *in toto* by Justices Souter, Stevens, Ginsburg, and Breyer, and narrowed by Justice Kennedy's concurring opinion—the Court held unconstitutional the two-round interrogation used by some in law enforcement to sidestep *Miranda.* In *Seibert,* police—in accordance with what the plurality called a "protocol"[12]—questioned Seibert at the

---

tention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint") (emphasis added); *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir.1996) ("Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by *routine questioning* of those seeking entry to the United States") (quoting *United States v. Lueck,* 678 F.2d 895, 899 (11th Cir.1982)) (emphasis added); *United States v. Troise,* 796 F.2d 310, 314 (9th Cir.1986) ("*Routine questioning* by the Coast Guard or Customs officials is not the sort of

custodial situation that normally triggers the *Miranda* requirement") (emphasis added).

**11.** The Government admits that CBP inspectors suspected criminal conduct from the outset, knowing that "Chinese nationals might travel with a guide, who had a legitimate Singaporean passport, and attempt to *illegally* enter the United States with false or recycled Singaporean passports." Gov.'s Resp. to Def.'s Mot. To Suppress Statement Against Interest at 2 (emphasis added).

**12.** The first sentence of Justice Souter's opinion for the plurality said, "This case tests a police protocol for custodial interrogation

police station about an arson murder without first advising her of her rights. *Id.* at 2606. After Seibert incriminated herself, the police gave her a twenty-minute coffee break. *Id.* When the interrogation resumed, the police advised Seibert of her *Miranda* rights, which she waived. *Id.* An officer then confronted Seibert with her earlier admission and elicited a confession that the State used to convict her. *Id.*

The plurality held this two-round interrogation technique unconstitutional because it believed *Miranda's* survival depended upon it: "[T]he question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 2613. The plurality distinguished the Court's earlier decision in *Oregon v. Elstad,* 470 U.S. 298, 319, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which held that a suspect who first answered inadvertently unwarned questions may, after a midstream warning, validly waive his rights and provide an admissible statement.

In *Elstad,* the police went to Elstad's house to take him into custody on a burglary charge. *Id.* Before the arrest, one officer spoke with Elstad's mother while another briefly questioned him in another room. *Id.* at 301, 105 S.Ct. 1285. Elstad admitted that he was present at the scene of the burglary.[13] *Id.* Later, at the police

station, after receiving the *Miranda* warnings, he fully confessed. *Id.* at 301–02, 105 S.Ct. 1285. Stressing that the first brief encounter lacked any "earmarks of coercion," *id.* at 316, 105 S.Ct. 1285, the Court held that it was constitutional to admit Elstad's confession. *Id.* at 319, 105 S.Ct. 1285.

In *Seibert,* the plurality contrasted *Elstad* by listing five factors that bear on whether courts should hold midstream *Miranda* warnings effective:

> (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 2612 (parentheses and numbers added). The Court then applied these factors.

First, the plurality suggested that the first-round questions and answers were complete and detailed because, "[w]hen the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.* Second, the plurality intimated that the statements Seibert made in the round one interrogation significantly overlapped with her statements in round two. It noted that, in round two, the interrogat-

---

that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." *Seibert* at 2605. His opinion is replete with citations to police guides that explain and formalize the procedure the Missouri officers applied in *Seibert.* *See id.* at 2609, n. 2, and accompanying text. Indeed, it was the very ubiquity of those protocols that led the plurality to fear *Miranda's* rule being swallowed up by law enforcement's aggressive application of *Elstad* (discussed below).

**13.** The officer later described the living room colloquy:

I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, "Yes, I was there."

*Id.* at 301, 105 S.Ct. 1285.

ing officer built on Seibert's round one admissions by setting the scene, "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" *Id.* at 2613. The plurality provided no explicit guidance as to what this second factor means.

Third, the plurality considered the timing and setting of the first and second rounds. It highlighted that Seibert's two confessions were separated by only twenty minutes, *id.* at 2612, and occurred in the same room. *Id.* Fourth, although the plurality never considered expressly the continuity of police personnel, it did underscore that the same officer conducted the first and second rounds of interrogation. *Id.*

Lastly, the plurality discussed the degree to which the interrogator's questions treated the second round as continuous with the first. It emphasized that the "impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." 124 S.Ct. at 2613. In other words, because the same officers continued Seibert's interrogation in the same place and in the same timeframe, round two was a mere extension of round one. *Id.*

Based on its application of these five factors, the plurality concluded that Seibert's round two confession was inadmissible. As noted above, however, only four justices endorsed Justice Souter's opinion

*in toto.* Because Justice Kennedy supplied the requisite fifth vote, we examine the limitations he was at pains to enunciate in his concurring opinion.

Justice Kennedy wrote that he would restrict the plurality's test to situations in which law enforcement personnel deliberately use the two-step interrogation technique for the purpose of dodging *Miranda:*

> I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning . . . . If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.

*Id.* at 2616 (Kennedy, J., concurring).

In other words, Justice Kennedy wrote that courts should add two additional steps to the plurality's test. As the very first step—before considering the plurality's five factors—a court should determine whether law enforcement personnel deliberately employed the two-round interrogation strategy for the purpose of sidestepping *Miranda.*[14]

---

**14.** Also, it bears emphasis that, in *Reinert v. Larkins,* 379 F.3d 76, 91 (3d Cir.2004), our Court of Appeals described facts much more akin to *Elstad* than *Seibert* because the interrogating officer's "initial failure to read [the defendant] his *Miranda* rights, though unfortunate and unexplained, seems much more likely to have been a simple failure to administer the warnings rather than an *intentional withholding that was part of a larger, nefarious plot."* (emphasis added). This language sug-

gests that our Court of Appeals would, like Justice Kennedy, limit *Seibert's* application to cases in which law enforcement deliberately uses the two-round strategy to dodge *Miranda.*

In *Reinert,* a habeas corpus petitioner argued that the trial court should have ruled inadmissible his post-*Miranda* confession to a police officer because the confession followed too quickly on the heels of an inculpatory non-Mirandized statement. *Id.* at 90. Em-

Then, as the final step—after applying the five factors enunciated by the plurality—Justice Kennedy was of the view that the court should determine whether the officers took "curative measures ... designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.*[15]

### 4. *Application*

■ To synthesize, a court applying *Seibert* should follow three steps. First, the court should determine whether law enforcement personnel deliberately employed the two-round interrogation strategy for the purpose of sidestepping *Miranda.* Justice Kennedy's concurrence requires this.[16] Then, to determine whether a given situation is more like that in *Elstad* or *Seibert,* the court should apply the five factors the *Seibert* plurality enunciated. Finally, if after applying these factors, the court concludes that the facts are more like those in *Seibert* than *Elstad,* it should follow a third, final step: determining whether the interrogator took any curative

measures.[17] Assuming that he or she did not, the confession is inadmissible.

■ First, we consider whether the agents here deliberately employed a two-round interrogation strategy for the purpose of sidestepping *Miranda.* We conclude that they did not. As noted, two customs officials successively interrogated Kiam, Inspector Roman and Agent Kozak. The first time Roman and Kozak ever discussed Kiam was at about 4:00 p.m., when Roman called Kozak to request that Kozak open a criminal investigation. Notably, this second Kiam discussion occurred *after* Roman had already ended Kiam's round one interrogation. Thus, Roman and Kozak could not have conspired *ex ante* to "tag-team" Kiam.

■ In any event, even if we apply the five *Seibert* factors, Kiam's suppression claim still fails. As for the first factor— the completeness and detail of the questions and answers in the first round of interrogation—Roman's twenty-five minute, round one interrogation of Kiam yielded just a kernel of what Kozak's three-hour interview produced. Roman's interrogation, for example, led Kiam to admit

phasizing that "it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally," *id.* at 91 (quoting *Seibert,* 124 S.Ct. at 2612), our Court of Appeals rejected the petitioner's claim. *Id.*

Our Court of Appeals's reading of *Seibert* bolsters our conclusion that, as a first step, courts should determine whether allegedly improper two-round interrogations are premeditated or inadvertent.

15. The *Seibert* plurality highlighted that the absence of a curative warning is "clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation." *Id.* at 2613 n. 7.

16. We do not ignore Justice O'Connor's dissenting criticism of the subjective dimension of Justice Kennedy's approach, a dimension the jurisprudence has wisely sought to avoid for the reasons Justice O'Connor delineates. *See* 124 S.Ct. at 2618–19 (dissenting Op. of O'Connor, J.).

17. Justice Kennedy gave two examples of the curative measures he had in mind. First, a "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* at 2616 (Kennedy, J., concurring). Second, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Id.* (Kennedy, J., concurring).

that he knew the three Chinese aliens and helped them enter the United States. In contrast, Kozak's interrogation induced Kiam to admit:

(1) the identity of the mastermind who hired him, a man named Lawrence;

(2) the places where he met Lawrence;

(3) the details of each conversation he had with Lawrence;

(4) the amount of his compensation;

(5) the facts surrounding his first alien smuggling plot;

(6) the contacts Kiam had with Lawrence's European underlings;

(7) the first meeting Kiam had with the three Chinese aliens;

(8) the detailed account of their actions between that first meeting and the April 27, 2004 apprehension; and

(9) the fact that Kiam suspected that his actions were illegal.

Def.'s Mem., Ex. A, at 1–3. Accordingly, we conclude that the detailed second-round questions and answers eclipsed those of the abbreviated first round.

Considering the second *Seibert* factor (the overlapping content of the two statements), the content, to be sure, undoubtedly overlapped somewhat. It is difficult to imagine many cases involving aliens in which it would not, since all aliens are obliged to answer officers' questions at ports of entry. Here, Kiam did make admissions to Roman, and Kozak's subsequent interrogation of Kiam dug deeply into the details of Kiam's initial confession. Thus, this factor weighs in Kiam's favor.

As to the timing and setting of the first and second rounds, while, like *Seibert*, the setting remained the same interrogation room, the timing changed. Roman began the first interrogation at around 3:35 p.m., ending it at about 4:00 p.m., and Kozak began his interrogation around 5:10 p.m.,

ending it at about 8:15 p.m. Thus, over an hour, rather than twenty minutes, separated the two interrogations. This tips the scale slightly in the Government's favor.

The fourth factor, the continuity of personnel, weighs heavily in the Government's favor. Unlike Patrice Seibert's experience, different officers conducted Kiam's interrogations. Because separate personnel questioned Kiam, a reasonable person in Kiam's shoes would likely have viewed each session as unique. *Cf. United States v. Hernandez–Hernandez*, Crim. No. 03–2251, 384 F.3d 562, 566–67 (8th Cir.2004) (holding that, under *Seibert*, defendant's round two confession was admissible when different officers conducted the rounds).

Fifth, we consider the degree to which the interrogator's questions treated the second round as continuous with the first. Unlike *Seibert*, in which the interrogator gave the "impression that the further questioning was a mere continuation of the earlier questions and responses ... [by] refer[ring] back to the confession already given," 124 S.Ct. at 2613, round one and round two of Kiam's interrogation markedly diverged. First, Roman and Kozak used different interrogation methods. Roman sought to expose inconsistencies in Kiam's story, while Kozak sought to prompt Kiam to paint a detailed picture of his plot. Also, while Roman solely asked questions, Kozak not only asked questions but also reduced Kiam's answers to writing and had Kiam review and amend this writing for accuracy. Finally, while Roman provided Kiam no access to an interpreter, Kozak ensured that Kiam had access to Mr. Wong throughout their conversation. These different methods, personnel and timing of the interrogations would lead a reasonable person in Kiam's situation to view Kozak's questioning as a fresh, distinct experience from Roman's.

Because we conclude that three factors—one, four, and five—weigh in favor of the Government, and one factor—three—weighs slightly in Kiam's favor, we conclude that Kiam's case is more like *Elstad* than *Seibert*.[18] This moots the need for us to engage in the third *Seibert* step, determining whether the interrogator took any curative measures.

## C. *Conclusion*

As we said at the close of argument at the suppression hearing, *Seibert* is in tension with *Elstad,* a decision with which no Justice in *Seibert* professed to take issue. In the context of aliens seeking entry into the United States, that tension is almost unbearable because Homeland Security officers must question all aliens at ports of entry, and that questioning often can necessarily be quite detailed. While *Seibert* in our view complicates the work of officers like Inspector Roman where suspicion focuses in advance on a particular alien, what ultimately happened here did not offend *Miranda.*

We therefore will deny Kiam's motion.

### *ORDER*

AND NOW, this 22nd day of October, 2004, upon consideration of defendant's motion to suppress statement against interest (docket no. 39), and the Government's opposition thereto, and after a hearing on October 20, 2004, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that the defendant's motion is DENIED.

---

18. We realize that a court applying the *Seibert* factors should not simply weigh them quantitatively but also qualitatively. In another case, we would possibly consider ruling in a defendant's favor if, say, four factors tipped only slightly in favor of the Government but the fifth factor tipped heavily in the defendant's favor. But that simply is not the case here.